UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MANUEL PEREZ,

                              Petitioner,                    **<u>MEMORANDUM & ORDER</u>**

              -against-                                      09-CV-1985 (SLT)

ROBERT ERCOLE,

                              Respondent.
-------------------------------------------------------------x
**TOWNES, United States District Judge:**

    <u>Pro se</u> petitioner Manuel Perez, who was convicted in New York State Supreme Court,

Queens County, of Robbery in the First Degree, Robbery in the Second Degree, Criminal

Mischief in the Fourth Degree, and Resisting Arrest, seeks a writ of <u>habeas</u> <u>corpus</u> pursuant to 28

U.S.C. § 2254.  Perez alleges that he was denied due process and effective assistance of counsel

because:  (1) the trial court should have appointed new counsel to represent him at the post-

verdict competency hearing; (2) the trial court should have expanded the hearing to determine

whether he was competent at trial; (3) the trial court should not have sentenced him because he

was unfit; (4) the trial court lacked jurisdiction over his case because his grand jury waiver of

immunity was invalid; and (5) the police lacked probable cause to arrest him.  For the reasons set

forth below, the petition is denied.

## I.       BACKGROUND

    This case stems from three robberies committed at gunpoint – two in bodegas and one in

a parked car – that took place in Corona, Queens, in January 2002. The last victim alerted police

and less than an hour later spotted Perez at a nearby restaurant, where officers recovered a gun

and empty magazine.  They arrested Perez, whom four witnesses separately identified during

lineups the next day.  Forensics also matched the gun to the shell casing recovered from the first

bodega. Perez was charged under New York state law with three counts of Robbery in the First Degree, two counts of Burglary in the Second Degree, and one count each of Robbery in the Second Degree, Reckless Endangerment in the First Degree, Criminal Mischief in the Third Degree, and Resisting Arrest. The burglary charges were dismissed on the People's motion at the commencement of trial and the reckless endangerment charge was dismissed on a defense motion prior to jury deliberations.

### A.    Pretrial Suppression Hearing

On February 19 and 21, 2003, the trial court held a hearing pursuant to United States v. Wade, 388 U.S. 218 (1967) and Mapp v. Ohio, 367 U.S. 643 (1961) to address Perez's motion to suppress (1) identification testimony, which included identification at the restaurant and at the lineups; and (2) physical evidence, which included the gun and magazine. (See S.H. at 4)[1].

Three witnesses testified at the hearing. Police Officers Keri Hoovert and Christopher Camacho stated that they were involved in canvassing for the person who robbed a man in his parked car in the early morning hours of January 29, 2002. (S.H. 6-8, 35-36). According to their testimony, the complainant rode with them for approximately forty-five minutes, and then stated that he saw the perpetrator, later identified as Perez, inside a well lit restaurant with large front windows. (S.H. 7, 36, 39-41). Perez was sitting on a stool at the bar and Officer Hoovert saw him stand up, "futsing with his waistband, pulling his pants, pulling his shirt," and walk to the

---

[1]    "S.H." refers to the transcript of the pretrial suppression hearing on February 19 and 21, 2003. "S.D." refers to the transcript of the proceeding on March 3, 2003, when the court denied the suppression motion. "H-1.," "H-2.," "H-3.," "H-4.," "H-5.," and "H-6." refer to the transcripts of the pretrial proceedings on April 7, May 8, September 25, and September 30, 2003, and March 23 and June 7, 2004, respectively. "Tr." refers to the trial transcript. "H-7." and "H-8." refer to the transcripts of the post-verdict proceedings on September 28, 2004, and March 24, 2005, respectively. "S." refers to the transcript of the sentencing on March 29, 2005. "Resp. Ex." refers to the exhibits annexed to Respondent's declaration dated September 18, 2009. (Docket Nos. 14-20). "Pet. Ex." refers to the exhibits annexed to Perez's petition. (Docket No. 1). "Reply Ex." refers to the exhibits annexed to Perez's traverse papers filed in hard copy on November 25, 2009. (Docket No. 25 ("Reply")).

back of the restaurant before returning to his seat. (S.H. 8-9). The officers asked Perez to step outside, where they observed the complainant confirm the identification, performed a pat-down on Perez, and recovered a gun magazine from his right front pants pocket. (S.H. 9-10, 38). Officer Camacho then proceeded to the back of restaurant, where he located a black handgun inside an empty case of beer bottles. (S.H. 38). Officer Hoovert placed Perez under arrest. (S.H. 10). On January 30, 2002, just after midnight, Detective Kenneth Paccio held a series of lineups related to the investigation of that and two prior robberies. (S.H. 56). He testified that four witnesses separately identified Perez from the lineups. (S.H. 58-60).

Justice Joseph Grasso denied Perez's motion to suppress in its entirety. (S.D. 7). As to identification, the court determined that the canvass was proper, where the complainant was in the police van and the first identification through the restaurant windows "seemed to be a self-generated one." (S.D. 6). The court found that this identification "in and of itself establishes probable cause" and that the additional identification after Perez exited the restaurant was merely confirmatory. (S.D. 6-7). Justice Grasso also concluded that there was probable cause to place Perez in the lineup and that the lineup itself was fair. (S.D. 7). As to the physical evidence, the court found that Perez had no standing to challenge the seizure of the gun because there was no expectation of privacy at the restaurant and "[i]t appears in any event that the property would have been abandoned in an attempt by Mr. Perez to conceal that weapon." (S.D. 7).

### B. Pretrial Section 730 Examination

On April 7, 2003, defense counsel Thomas Sheehan, Esq., requested an examination pursuant to New York Criminal Procedure Law ("CPL") § 730.30,[2] to assess Perez's fitness to

---

[2] Section 730.30(1) requires that a court "issue an order of examination when it is of the opinion that the defendant may be an incapacitated person." Section 730.10(1) defines an incapacitated person as one "who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense."

stand trial. (H-1. 2). When asked whether he knew the charges against him, Perez claimed, "I don't know anything." (H-1. 3). Perez also stated that he was on medication for depression and had been hearing voices. (H-1. 2-3). The court granted the request for examination, which the People did not oppose. (H-1. 3). On May 8, 2003, the court reviewed the Section 730 reports, concluded that Perez was not fit to proceed, and committed him to the jurisdiction of the Mid-Hudson facility, a secure adult psychiatric center. (H-2. 3).

On September 25, 2003, the court opened the conference by noting that Perez had been released from Mid-Hudson where those overseeing his care "are of the view that [Perez has] been restored to competence." (H-3. 3). Perez was being held in the mental health unit at Rikers Island and was receiving medication three times a day. (H-3. 3). The court found that "Perez gives the appearance of being competent," a position both sides accepted. (H-3. 4). The court also commented that "nobody is saying that the man is necessarily without psychiatric problems. He may well have them. We are talking about a very narrow sense of competence as defined in Article 730 of the Criminal Procedure Law." (H-3. 4).

**C.    Request for New Counsel**

After a number of perfunctory appearances, Justice Evelyn L. Braun held a conference on March 23, 2004, during which Perez sought to have a new attorney assigned to his case. Displaying a certain knowledge of procedure, Perez stated: "I feel that my attorney's represented me bad. I was denied a 30.30[3] because he hadn't showed up several times." (H-5. 4). Perez also complained that he was "being persecuted by this Court," prompting Justice Braun to respond, "I don't think you are being persecuted, I think you are playing games." (H-5. 6). Defense counsel averred that there had been an "irreparable" breakdown of cooperation in

---

[3]    CPL Section 30.30 addresses speedy trial limitations under New York law, providing the time periods within which the prosecution must be ready for trial or dismiss the case.

the relationship with his client.  (H-5. 8).  Justice Braun ultimately relieved Mr. Sheehan and recused herself from the case, though criticizing Perez's "ridiculous remarks and allegations." (H-5. 11).  In closing the conference, the court concluded that Perez "obviously . . . has some personality problems that don't affect . . . his ability to go to trial."  (H-5. 11).  From that point forward, defense counsel Andrew S. Wogan, Esq., represented Perez as trial counsel.  (H-6. 2-4).

### D.    Trial

The People's evidence at trial would have permitted a reasonable juror to find as follows. (The defense did not call witnesses).

#### 1.    Kiko Groceries Robbery

Eduardo Checo testified that at the time of the incident he was working at Kiko Groceries, a small bodega he owned in Queens.  (Tr. 325-26, 343).  On January 12, 2002, at approximately 9:15 p.m., he was taking care of customers alone, when another person entered the bodega and stood back from the others waiting to pay.  (Tr. 327-28).  Checo thought that the person was just another customer until he walked up to Checo at the counter, "pulled out a weapon and he fired a shot.  And he said, this is a holdup."  (Tr. 328, 329).  The bullet landed in front of the counter and "went into the Coca Cola refrigerator," whereupon two remaining customers dropped to the floor.  (Tr. 329, 330).  Checo testified that the shooter pointed the gun at him and demanded his money and jewelry.  (Tr. 330).  After Checo relinquished approximately $700 to $800, two chains, and a ring, the perpetrator left the store and Checo called the police, who collected "a spent bullet and . . . copper jacket" at the scene.  (Tr. 330-31, 620).  Checo stated that during the confrontation, he and the perpetrator stood face to face with only the counter between them and that the store was lit as brightly as the courtroom.  (Tr. 331-

32). On cross examination, Checo admitted that he had used and pleaded guilty to possession of cocaine during the same year as the robbery. (Tr. 343-44).

### 2. Baez Grocery Robbery

The prosecution also called Jose Baez, who owned and worked at the Baez Grocery in Corona, Queens. (Tr. 377, 382). Baez testified that on January 28, 2002, at approximately 3 p.m., a beer vendor had just left the bodega when an unknown man entered and purchased peanuts. (Tr. 378-80). Jose Baez's brother, Francis Baez, and a friend, Francisco Reinoso, arrived at the store just before Jose Baez gave the man change. (Tr. 380). Reinoso testified that he had recently seen the same man in the neighborhood. (Tr. 534-36, 550-51). The man departed and Jose Baez went downstairs to use the bathroom, leaving his brother and Reinoso in the grocery area. (Tr. 380, 389, 584). According to Reinoso, who said he was a police officer in Santo Domingo, the man returned to the bodega approximately five minutes later (while Jose Baez was still in the basement) and put a gun to Reinoso's back. (Tr. 518-19). The man said in Spanish that it was a robbery and Reinoso should give him everything. (Tr. 519). He also demanded that Francis Baez give him money from the cash register. (Tr. 520, 587). When Francis Baez said he had no money and knew nothing about money in the store, the man proceeded to empty the cash register himself. (Tr. 521, 587). Reinoso also gave the man his watch and bracelet. (Tr. 521, 590). After some confusion with ordering Francis Baez to go down to the basement, the perpetrator lowered his gun, ran out of the bodega, and departed in a livery cab. (Tr. 522-23, 590-91).

### 3. Parked Car Robbery

John Gutierrez testified that on January 29, 2002, at approximately 4:10 a.m., he saw a man approaching as he left a Queens restaurant and began to walk to his parked car. (Tr. 469-

70).  It seemed as though the man was following him, so Gutierrez walked past his car toward a sanitation truck he saw on the corner – but the truck left before he reached it.  (Tr. 470-71, 486).  After Gutierrez returned to and entered his car, the man knocked on the window, "pulled a gun," and demanded money.  (Tr. 471-72).  Gutierrez said he was the "wrong person," but the man repeated his demand and warned that "this is the reason why people around here . . . get killed."  (Tr. 473).  Gutierrez relinquished approximately $150 to $200 in case before the man departed.  (Tr. 473).

Gutierrez immediately flagged down a police van and said he was just robbed.  (Tr. 474).  At the two officers' request, Gutierrez got in the van and canvassed for approximately forty-five minutes until they approached a restaurant and Gutierrez told the officers he thought he saw the perpetrator inside.  (Tr. 475-76, 400, 430).  The restaurant was well lit with two large and unobstructed frame windows; the police van also had a strobe light pointed at the front.  (Tr. 401-02, 431).  The officers testified that they saw the man inside stand up, place his hand in his waistband, and then walk to the back left of the restaurant, where he was briefly hidden behind a door.  (Tr. 402-03, 432).  The officers stood at the entrance of the restaurant and asked the man to step outside, which he did.  (Tr. 403-04, 433-34).  Gutierrez testified that when the police officers brought the man over for a better look, Gutierrez "knew it was him and . . . told them that was him."[4]  (Tr. 477).  Officer Hoovert placed Perez in handcuffs and patted him down for weapons, recovering an empty magazine clip for a nine millimeter gun from Perez's front pants pocket.  (Tr. 406, 435-36).  At that point, Officer Camacho testified that he went to the back of the restaurant where he had seen Perez disappear earlier and retrieved a semi-automatic handgun,

---

[4]     Perez has contended at various times that there was no one in the police van.  (See, e.g., S. 20; Reply at 30-31; Reply Ex. A Aff. ¶ 13).

without a clip, from inside an empty case of beer bottles. (Tr. 436). He brought it over to the van and Gutierrez stated that he recognized it from the robbery. (Tr. 437, 478).

Both officers testified that Perez became "erratic" and began to scream, kick, and curse. (Tr. 407, 441). Officer Hoovert ultimately placed Perez into a different police car and, as the arresting officer, vouchered the gun and magazine clip. (Tr. 408-09). Officer Phillip Adaszewski, who manned that police car, testified that Perez kicked out the driver's side back window and Emergency Services Unit responded, which deals with situations such as emotionally disturbed or barricaded people. (Tr. 506, 510-11). When ESU arrived, Perez was placed in a physical restraint. (Tr. 512). On cross examination, Officer Adaszewski maintained that he did not hear or see anything that led him to believe Perez was having difficulty breathing. (Tr. 509).[5]

### 4.    Lineups and Forensics

Assistant District Attorney Peter Lomp testified that he observed the lineups conducted in the early morning hours of January 30, 2002, at the 115th Precinct. (Tr. 459-60). Perez was given the opportunity to choose his own number as one of six individuals included in the lineups. (Tr. 461, 462). All four witnesses, including Reinoso (Tr. 527), Francis Baez (Tr. 591-92), Checo (Tr. 336-38), and Jose Baez (Tr. 383-84) each independently identified Perez during the separate lineups, (Tr. 616). The entire procedure took eight minutes. (Tr. 467).

Additionally, Detective Anthony Pellicio, who served in the Firearms Analysis Section of the New York Police Department, testified that he compared cartridge components recovered from the first robbery scene to samples produced from a "test fire" of the vouchered gun. (Tr.

---

[5]    Perez maintains that he kicked out the window because he was suffering an asthma attack. Ambulance records show that Perez was treated with oxygen after he presented with respiratory distress and had been sprayed with mace. (See Reply Ex. A (attached as Exhibit C to Perez's error coram nobis motion)).

626, 634). He determined that (1) the piece of copper jacketing lacked sufficient characteristics to form a conclusion, but (2) the shell casing was in fact fired from the same firearm as the test samples. (Tr. 644-45).

### E. Verdict

On July 27, 2004, the jury found Perez guilty of three counts of Robbery in the First Degree, and one count each of Robbery in the Second Degree, Criminal Mischief in the Fourth Degree, and Resisting Arrest. (Tr. 753-57). At the conclusion of the proceedings that day, defense counsel requested and the court ordered a pre-sentence examination of Perez.[6]

### F. Competency Hearing

On September 28, 2004, the trial court noted that it had received a report from clinical psychologist Dr. Jennifer Mathur indicating that Perez, "according to her view[,] is unfit to proceed." (H-7. 2). The court therefore ordered a Section 730 examination in aid of sentencing. (H-7. 2). Justice Seymour Rotker also considered and denied Perez's pro se application that the verdict be set aside, inter alia, on the ground that police fabricated probable cause evidence – commenting that "I must say for a person who is not competent to proceed, he did a very workman like legal motion."[7] (H-7. 3).

On March 24, 2005, after receiving the Section 730 report, the court held a hearing to determine Perez's competency for sentencing. (H-8. 2). Four experts testified as to their examinations of Perez and their competency conclusions.

---

[6]     Page 759, the last page of the transcript relating to the verdict, appears to be missing, but context from the subsequent proceeding and Respondent's papers indicates that defense counsel requested an examination as part of the pre-sentence report under CPL § 390. (See Tr. 758; H-7. 2; Resp. Opp. at 8).

[7]     Perez notes in his papers, as he stated to the court, that the author of his purportedly pro se motions was actually another Rikers Island inmate, Blake Wingate, a law library clerk. (Reply Ex. C; S. 2-3).

### 1.     Dr. Jennifer Mathur

First, Dr. Mathur testified that she found Perez not fit to be sentenced based on "his presentation, depressed mood and anxiety as well as suicidal ideation" and her feeling that "he was at risk for self-injury."  (H-8. 4-5).  She commented that Perez had a history of alcohol, heroin, and cocaine abuse.  (H-8. 8).  Dr. Mathur admitted, however, that she "had some questions about whether [Perez] was exaggerating his impairment of memory as well as psychosis," and that her recommendation "was based specifically on the risk of self injury that [she] believed to exist."  (H-8. 5-6).

### 2.     Dr. Richard Weidenbacher

Forensic psychiatrist Dr. Richard Weidenbacher next testified that Perez was not competent to proceed because the doctor "felt that [he] could not say that [he] knew that [Perez] would not hurt himself."  (H-8. 14).  Like Dr. Mathur, Dr. Weidenbacher "had a strong suspicion" that Perez was malingering and that his statements during the exam were "contrived and disingenuous," including "his ostensible or apparent rumination or impulse thought about suicide."  (H-8. 13).  Still, Dr. Weidenbacher explained that "frustrated" defendants sometimes hurt themselves "even if they don't really want to kill themselves," so he was "conservative" in his report.  (H-8. 13-14, 16).    Dr. Weidenbacher also commented that he had "no grounds at all at this point to propose that [Perez] was . . . incompetent during trial," in part because he trusted that an officer of the court would have intervened.  (H-8. 15).  Moreover, the doctor stated that in reviewing Perez's pro se application previously denied by the court, "no matter who the author was for sure in terms of who wrote it down, it points to a certain amount of resourcefulness and, probably, a certain amount of detailed memory" on the part of Perez.  (H-8. 24).

### 3. Dr. Narasimhan Narasimhan

Psychiatrist Dr. Narasimhan Narasimhan testified that he had treated Perez for approximately two weeks in 2004, and had more recently performed a Section 730 examination. (H-8. 32). Dr. Narasimhan diagnosed Perez with an adjustment disorder that can occur in response to a stressful event. (H-8. 34). He did not find acute psychotic or suicidal disorders at the time of examination and felt that Perez appeared to be alert to his surroundings. (H-8. 34). Dr. Narasimhan also stated, in answer to the court's question, that even someone with depression and suicidal ideation could be able to participate in the events taking place around him. (H-8. 39-40).

### 4. Dr. Elizabeth Owen

Finally, forensic psychologist Dr. Elizabeth Owen testified that she met with Perez on three occasions. (H-8. 41-42). She determined that Perez was oriented as to person and place, that he understood the charges against him, and that he could assist his attorney, but nevertheless found him unfit for sentencing "[p]rimarily" based on the stressful nature of the proceedings and Perez's suicide risk. (H-8. 43, 47-48). Dr. Owen also performed memory tests which suggested that Perez was malingering or at least "trying to present himself as more impaired that he really is" and "exaggerating his psychiatric symptoms." (H-8. 45, 47). In her report, Dr. Owen noted that Perez described a conspiracy among "anyone associated with the case" and complained that police officers were buying witnesses to testify against him as early as 1996. (H-8. 51, 53).

### 5. Fitness Determination

Defense counsel contended that the People had not met their burden because three of the four expert witnesses found Perez not fit to proceed. (H-8. 58). In response, the prosecutor pointed to the legal definition of an incapacitated person as one who "lacks capacity to

understand the proceedings against him or to assist in his own defense."  (H-8. 59 (quoting CPL § 730.10(1)).  She argued that none of the experts had found Perez incapacitated within that definition and those who found him unfit had done so "purely from a concern that he might harm himself."  (H-8. 63).  The court ultimately agreed with the People's position, finding that "based upon the credible evidence" Perez was fit to proceed to sentencing.  (H-8. 67).  Perez thereupon complained that he felt dizzy and the court scheduled another hearing to allow him to decide whether he wanted to challenge the constitutionality of the conviction.  (H-8. 70).

### G.    Sentence

At the March 29, 2005, conference, defense counsel informed the court that Perez had tried to commit suicide and that he was back in the psychiatric hospital.  (S. 2-3).  Additionally, Perez submitted what appeared to be a second pro se motion, labeled "Addendum/Rebuttal," to vacate the verdict on the grounds that he was incompetent to stand trial and that his counsel had failed to move for a Section 730 examination prior to trial.  (See Reply Ex. C).  Having reviewed the submission, the court noted for the record that "whatever the paperwork is, if it constitutes a motion, which I can't figure out if it does or doesn't, I am returning it to the defendant" because it was written by a non-attorney inmate from Rikers Island and therefore "inappropriate at this time."  (S. 3).  As the court began the sentencing process, Perez objected in a series of exchanges with Justice Rotker, stating:

> I am in no condition to talk at all at this moment.  I tried to commit suicide yesterday and I don't feel good . . . . And that's what I intend to go on doing.  I'll take my life . . . . I need another day.  I am not feeling well . . . . My medication has me very dizzy.

(S. 5-6).  When the court decided to proceed, noting that "based upon his prior situation [Perez] may or may not be malingering," Perez immediately indicated to his attorney that he wanted to challenge his predicate felony status:

|                |                                                                                                                                                                              |
|----------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| MR. WORGAN:    | Judge, I think that the challenge he is making is the ten-year period.                                                                                                        |
| THE COURT:     | You spoke to your client?  And what is he saying?                                                                                                                            |
| MR. WORGAN:    | He is saying that the 1990 conviction is without the ten-year statute for predicate status.                                                                                 |
| THE COURT:     | This is what he told you?                                                                                                                                                    |
| MR. WORGAN:    | Just now.                                                                                                                                                                    |
| THE COURT:     | Let the record note that the defendant seems to be conversant with the legal issues with regard to this question concerning the fact of his prior felony convictions.        |

(S. 6-7).  After reviewing the dates and the statutory requirements, defense counsel conceded that the conviction was within the ten-year period and the court found Perez to be a second felony offender.  (S. 8-9, 15).

At that point, Perez interjected that he "need[ed] two or three days" and was "in no condition to receive a sentence."  (S. 20).  He also stated that:

> [M]ost of the evidence in this case is fabricated.  It is evidence made up by the assistant district attorney and by the police.  Probable cause, it was also fabricated, and they also used a man to give false testimony, John Gutierrez, so he can fabricate probable cause.

(S. 20).  In response, Justice Roker stated that Perez "is really a malingerer . . . what he says and the way he says it.  I think defendant is playing the system or trying to play the system, and I won't have any of it."  (S. 21).  The court thereupon sentenced Perez to twenty years for each count of First Degree Robbery, twelve years for Second Degree Robbery, and one year for each misdemeanor count, to run concurrently.  (S. 21-22).  The court also imposed five years of post-release supervision.  (S. 22).  Perez's final comment at the hearing was to confirm with his attorney that he wanted to file a notice of appeal.  (S. 22-23).

### H.   Post-Conviction Procedural History

#### 1.   Direct Appeal

Perez appealed his conviction to the Appellate Division, Second Department, claiming that the trial court improperly deprived him of due process and effective assistance of counsel by failing (1) to appoint new counsel for the post-verdict competency hearing and inquire about Perez's competence at trial; and (2) to declare him unfit at sentencing.  (Resp. Ex. 1 at 2).  On December 11, 2007, the Appellate Division unanimously rejected Perez's claims.  People v. Perez, 46 A.D.3d 708 (2d Dep't 2007).  As an initial matter, it concluded that the trial court "providently exercised its discretion in declining to consider an addendum to the pro se motion" authored by someone other than Perez or his attorney – and where "the defendant himself disavowed authorship of the addendum in open court."  Id. at 709.  The Appellate Division therefore held that Perez's claim concerning appointment of new counsel was unpreserved and, in any event, without merit.  Id. at 708.  As to the issue of competency at trial, Perez had been found fit to proceed prior to trial, the trial record did not suggest that Perez was unfit during trial, and "nothing in the [pro se] addendum, even if it were properly considered by the [trial court], was sufficient to indicate" otherwise.  Id. at 709.  Finally, the Appellate Division found that the trial court had properly determined that Perez was fit to proceed to sentencing by a preponderance of the evidence.  Id.

By letter dated January 31, 2008, Perez sought leave to appeal the affirmance of his conviction to the New York Court of Appeals.  (Resp. Ex. E).[8]  On March 7, 2008, Associate Judge Eugene F. Pigott, Jr., summarily denied that application.  People v. Perez, 10 N.Y.3d 814 (2008) (Table).  Perez's conviction therefore became final on June 5, 2008, "when the ninety-day

---

[8]      An initial letter request may have been sent on January 7, 2008, though that letter does not appear in the record before this Court.  (See Resp. Ex. G at 6).

period following final state court review for seeking a writ of certiorari to the United States

Supreme Court . . . expired." Brownridge v. Miller, No. 06-CV-6777 (RJD)(SMG), 2010 WL

2816265, at *4 (E.D.N.Y. Feb. 19, 2010) (citing McKinney v. Artuz, 326 F.3d 87, 96 (2d Cir.

2003)).

### 2. Collateral State Court Proceedings

On May 29, 2008, Perez moved pro se for a writ of error coram nobis in the Appellate

Division, claiming that his appellate counsel was ineffective because she had failed to raise a

claim of ineffective assistance of trial counsel[9] on direct appeal. (Resp. Ex. F at 11-12). The

Appellate Division summarily denied this application on August 12, 2008. People v. Perez,

54 A.D.3d 382 (2d Dep't 2008).

On November 5, 2008, Perez filed a pro se motion in New York Supreme Court to vacate

his conviction pursuant to CPL § 440.10. (Resp. Ex. I). Perez claimed that the trial court (1)

lacked subject matter jurisdiction because his grand jury waiver of immunity was invalid; and (2)

should not have sentenced him because he was mentally incompetent. (Id. at 3, 13). Later in

these papers, Perez also argued that police officers did not have probable cause to arrest him and

that the robbery accusations "were completely fabricated." (Id. at 21). By order dated January

27, 2009, Justice Fernando M. Camacho denied Perez's motion, holding that (1) the grand jury

claim was procedurally barred because it was record-based and had not been raised on direct

appeal; and (2) the mental competency claim was barred because it had been raised and rejected

on direct appeal and related solely to the validity of the sentence, not the conviction. (Resp. Ex.

K). It does not appear that the court made explicit findings concerning Perez's probable cause

---

[9]     It seems that Perez was referring to the purported ineffectiveness of Mr. Sheehan, who
represented him at the pretrial proceedings, as well as Mr. Wogan, who represented him at trial.

argument.  On May 21, 2009, the Appellate Division denied Perez's request for leave to appeal that decision.  (See Docket No. 7 at 2).

## I.        Habeas Petition and Related Motions

Perez's petition is dated April 27, 2009, and was received by the Pro Se Office of this Court on May 6, 2009.  (Docket No. 1).  In his petition, Perez raises five claims, culled from his direct appeal and collateral attacks:  (1) the trial court should have appointed new counsel to represent him at the post-verdict competency hearing; (2) the trial court should have expanded the hearing to determine whether he was competent at trial; (3) the trial court should not have sentenced him because he was unfit; (4) the trial court lacked jurisdiction over his case because his grand jury waiver of immunity was invalid; and (5) the police lacked probable cause to arrest him.  (see id. ¶ 13).  As Respondent concedes, the petition is timely.  (Resp.'s Mem. at 17).  Respondent also concedes, and the Court agrees, that Perez has exhausted all of his asserted claims through direct and collateral review in state court, as required by 28 U.S.C. § 2254(b)(1).

On May 29, 2009, the Court referred Perez's motion to appoint counsel to Magistrate Judge Marilyn D. Go for determination.  On June 2, 2009, Judge Go denied the motion without prejudice, finding that Perez had not made a sufficient showing because his claims were not likely to be substantive and the legal issues were not complex.  (Docket No. 6).  On July 12, 2010, after Respondent had filed opposition papers and Perez had filed his reply, Perez filed a motion for leave to seek production of documents, expansion of the record, and appointment of counsel.  (Docket Nos. 27-28).  This Court denied his application for appointment of counsel for substantially the same reasons as Judge Go, and reserved decision as to his production requests. (Docket No. 29).

## II.    DISCUSSION

### A.    Procedural Default

As a preliminary matter, a claim resolved by a state court on independent and adequate state procedural grounds is generally not subject to habeas review by a federal court.  See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991); Harris v. Reed, 489 U.S. 255, 262 (1989). Moreover, when the last reasoned opinion on a particular claim explicitly applies a state procedural default, the federal court "will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits."  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).   Still, a federal court may review such a claim "if the petitioner can demonstrate 'cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice.'"  Gardner v. Fisher, 556 F. Supp. 2d 183, 193 (E.D.N.Y. 2008) (quoting Coleman, 501 U.S. at 750).

### B.    Standard of Review

Pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996, a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication . . .  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U .S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law if the state court applies a rule that contradicts governing Supreme Court precedent or the state court confronts a

set of facts that is materially indistinguishable from a Supreme Court decision and arrives at a different result. Williams v. Taylor, 529 U.S. 362, 413 (2000). A decision is an "unreasonable application" of clearly established federal law if the state court's application is "objectively unreasonable." Id. at 409. An erroneous application of federal law is not necessarily an unreasonable one. Id. at 410-11. Instead, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000) (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Although a federal court may also grant a habeas writ if a state court decision on the merits "was based on an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), such factual determinations are "presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence," § 2254(e)(1).

## C. Perez's Application

### 1. Ineffective Assistance

Perez argues that the trial court should have appointed him new counsel for the post-verdict competency hearing because, as he attempted to assert in a second pro se motion/addendum, his trial counsel was ineffective for failing to request an earlier Section 730 examination. (Pet. Ex. A at 20-22; Reply at 15). On direct appeal, the Appellate Division found that the trial court had properly exercised its discretion in declining to consider this motion and therefore the ineffectiveness claim was unpreserved for review. Perez, 46 A.D.3d 708. Indeed, while the Supreme Court has long recognized a criminal defendant's right to a full defense under the Sixth Amendment, see Faretta v. California, 422 U.S. 806, 818 (1975), it has also held that a state court is not "require[d] . . . to permit 'hybrid' representation," McKaskle v. Wiggins, 465 U.S. 168, 183 (1984). In this case, Perez was not entitled to have every pro se motion considered

by the trial court "[a]bsent invocation of his right to represent himself without the assistance of counsel." Delgado v. Duncan, No. 02-CV-4929 (JBW), 2003 WL 23185682, at *5 (E.D.N.Y. Nov. 4, 2003) (collecting cases). Accordingly, the state court's "refusal to entertain Petitioner's pro se motion[] because Petitioner was represented by an attorney is neither contrary to nor an unreasonable application of federal law as interpreted by the Supreme Court." Potter v. Green, No. 04-CV-1343 (JS), 2009 WL 2242342, at *10 (E.D.N.Y. July 24, 2009). Review by a federal court of the merits of Perez's underlying ineffective assistance claim therefore would be inappropriate and habeas relief unwarranted.

### 2. **Sua Sponte Competency Hearing**

Perez also argues that "it was incumbent upon the [trial] court to . . . address [his] argument in his pro se motion that he was incompetent at trial." (Pet. Ex. A at 26). As noted, it was neither contrary to nor an unreasonable application of federal law for the trial court to decline to consider Perez's second pro se motion/addendum, and the Appellate Division found the underlying claim unpreserved for review. See Perez, 46 A.D.3d at 708. Nevertheless, the Second Circuit has clearly stated that "when the trial court neglects its duty to conduct a hearing on competence, the defendant's failure to object or to take an appeal on the issue will not bar collateral attack" because a state court cannot "constitutionally apply a procedural default rule to a possibly incompetent defendant." Silverstein v. Henderson, 706 F.2d 361, 366-67 (2d Cir. 1983) (citations omitted). The question on the merits, therefore, is whether the trial court should have sua sponte expanded the competency hearing to consider Perez's mental fitness at trial.

The Supreme Court "has held that where the evidence raised a sufficient doubt as to a defendant's competence to stand trial, the failure of the trial court to conduct a competency hearing sua sponte violates due process." Nicks v. United States., 955 F.2d 161, 168 (2d Cir.

1992) (citing Pate v. Robinson, 383 U.S. 375, 385 (1966)); see Drope v. Missouri, 420 U.S. 162,

171 (1975) (defendant lacking legal capacity "may not be subjected to a trial"). However, a trial

court is not required to order a competency examination if it "has not been given reasonable

cause to believe that a defendant may be incompetent" or else the process "could be abused to

provide an automatic continuance of the trial date at a defendant's request." Medina v.

McGinnis, No. 04 Civ. 2515 (SHS) (AJP), 2004 WL 2088578, at *12 (S.D.N.Y. Sept. 20, 2004)

(collecting cases). See United States v. Nichols, 56 F.3d 403, 414 (2d Cir. 1995) (Due Process

Clause only requires a hearing "if the court has 'reasonable cause' to believe that the defendant

has a mental defect rendering him incompetent").

The Supreme Court has long acknowledged that there are "no fixed or immutable signs

which invariably indicate the need for further inquiry to determine fitness to proceed; the

question is often a difficult one in which a wide range of manifestations and subtle nuances are

implicated." Drope, 420 U.S. at 180. Ultimately, the "inquiry is whether, in light of what was

then known, the failure to make further inquiry into petitioner's competence to stand trial, denied

him a fair trial." Nicks, 955 F.2d at 169. In support of his contention that the trial court erred by

failing to expand the competence hearing sua sponte, Perez relies primarily on his history of

mental illness as well as the expert testimony indicating that his condition may have deteriorated

during trial. (Pet. Ex. A at 26-28; Reply at 19-20, 23-24). This claim fails for at least two

reasons.

First, the trial court had the opportunity to observe Perez during the entire trial and post-

verdict proceedings. For instance, while Perez often complained that he did not understand what

was happening and that he did not feel well, he also – sometimes at the same proceeding –

directed his counsel to challenge his predicate felony status, assisted in submitting a pro se

motion that the court did consider, and had his counsel confirm on the record that he wanted to file a notice of appeal.  (S. 6-7, 22-23).  Respondent also notes from the record that Perez understood his right to be present at side-bar conferences, assisted his attorney during jury selection, and was able to provide his identification information after the verdict.  (Resp. Opp. at 25-26).  Second, the trial court was privy to Perez's mental health history as part of the competency hearing ordered for sentencing.  With that background, the justice still noted on numerous occasions that Perez appeared to be malingering, an assessment shared to a large degree by the Section 730 examination experts themselves.

Based upon the foregoing facts, this Court cannot say that failure to make further inquiry into Perez's competence to stand trial denied him a fair trial.  Perez therefore is not entitled to habeas relief on this claim.

### 3.    Fitness at Sentencing

Perez next argues that the trial court should have granted defense counsel's request to adjourn after the Section 703 hearing because Perez was not fit for sentencing.  (Pet. Ex. A at 30-31; Reply at 28).  As discussed, under New York law, an incompetent person is someone who "as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense."  CPL § 730.10(1).  Under federal law, the relevant inquiry is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him."  Dusky v. United States, 362 U.S. 402, 402 (1960).

Perez argues in his papers that he did not have sufficient ability to consult rationally with his lawyer during the predicate felony hearing and sentencing proceeding.  (Reply at 26).  The record demonstrates otherwise.  As noted, immediately after the trial court denied his request to

adjourn sentencing, Perez indicated to his attorney that he wanted to challenge his predicate felony status determination. (S. 6-7). Indeed, the court noted for the record "that that the defendant seems to be conversant with the legal issues" under discussion at the hearing. (S. 7).

Additionally, while Perez is correct that three of the four experts testified that he was not fit to be sentenced, they also conceded (1) that their findings were based almost exclusively on a concern that Perez would try to harm himself; and (2) that Perez may have been malingering or exaggerating certain symptoms. (H.8. 5, 13, 14, 16, 24, 45, 47-48, 63). Risk of self-injury, though undoubtedly a serious issue, does not necessarily mean a defendant lacks the capacity to understand or participate in the proceedings against him. The court specifically questioned the expert witnesses on this distinction and ultimately determined that Perez was fit for sentencing under the legal definition "based upon the credible evidence." (H-8. 67). The Appellate Division affirmed. Perez, 46 A.D.3d at 708. In the context of a habeas petition, such factual determinations are "presumed to be correct" and Perez has failed to show by clear and convincing evidence that the state court's decision "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2), (e)(1).

### 4.      Grand Jury Immunity Waiver

Perez's fourth claim is that the trial court lacked jurisdiction to adjudicate his case because his waiver of immunity before the grand jury was defective. (Pet. Ex. B at 11, 13-14). This claim fails for two reasons. First, the Appellate Division found it procedurally barred because it was record-based but had not been raised on direct appeal. (Resp. Ex. K). Second, "[i]t is well-settled that federal habeas corpus review is not available to test the sufficiency of an indictment charging a crime within the state court's jurisdiction." Anderson v. Kelly, No. CV 91-1354 (DRH), 1992 WL 175665, at *4 (E.D.N.Y. July 14, 1992) (citing Knewel v. Egan, 268

U.S. 442, 446 (1925)); see also Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989) ("[C]laims concerning a state grand jury proceeding are . . . foreclosed in a collateral attack brought in a federal court."). Moreover, any defects in the indictment were "rendered harmless" upon Perez's conviction by the petit jury. United States v. Mechanik, 475 U.S. 66, 73 (1986). Indeed, contrary to Perez's jurisdictional assertions, "defects in an indictment do not deprive a court of its power to adjudicate a case." United States v. Cotton, 535 U.S. 625, 630 (2002). Perez's grand jury claim therefore is denied.

### 5.     Probable Cause

Perez's final claim concerns his assertion that police lacked probable cause for his arrest and that the robbery accusations were "completely fabricated." (Pet. Ex. B at 21). Perez indicates in his papers that "[t]his claim is based on [a] Fourth Amendment violation, where the trial court did not conduct [a] reasoned method of inquiry into relevant questions of facts and law in relation to petitioner's arrest." (Reply at 29). Perez initially raised this claim as part of his § 440 motion, (Resp. Ex. I at 21), which the Appellate Division denied in its entirety, (Resp. Ex. K).[10]

The authority of a federal court to conduct habeas review of Fourth Amendment claims is extremely narrow. See Stone v. Powell, 428 U.S. 465, 482 (1976); Palacios v. Burge, 589 F.3d 556, 561 (2d Cir. 2009) ("[Stone] bars us from considering Fourth Amendment challenges raised in a petitioner's petition for habeas relief."). As a general rule, Fourth Amendment claims are

---

[10]     Although it appears that the Appellate Division did not specifically address Perez's probable cause claim in denying the motion, that is of no moment. The Second Circuit has refused to "infer that an unconscionable breakdown occurred" in this context, noting that it would "place us in the position of dictating to state courts that they must issue opinions explicitly addressing the issues presented or else face 'second guessing' by the federal courts." Capellan v. Riley, 975 F.2d 67, 72 (2d Cir. 1992) (citing Coleman, 501 U.S. at 739 ("[W]e have no power to tell state courts how they must write their opinions.")).

not reviewable by a federal court unless the petitioner shows that he was deprived of a "full and fair opportunity to litigate" the issue in state court.  Graham v. Costello, 299 F.3d 129, 133-34 (2d Cir. 2002) (citing Stone, 428 U.S. at 481-82).  To make such a showing, a petitioner must demonstrate (1) that the state failed to provide corrective process to address the alleged Fourth Amendment violation; or (2) that there was an "unconscionable breakdown" in that corrective process.  Capellan, 975 F.2d at 70.

Perez fails to satisfy either prong.  First, it is well settled that "federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in [CPL] § 710.10 et seq. (McKinney 1984 & Supp. 1988), as being facially adequate."  Id. at 70 n.1 (quoting Holmes v. Scully, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)).  Second, Perez has not shown an "unconscionable breakdown" in that procedure.  He argues that "it was imperative for [the] trial court to grant a Dunaway[11] hearing to ascertain the legality of petitioner's arrest" and that "[h]ad the trial justice concluded that there was no probable cause to arrest, the case would have been thrown out."  (Reply at 35).

In this case, however, the state court held a pretrial suppression hearing, during which two arresting officers and a detective in charge of the lineups testified and were cross-examined as to the circumstances surrounding Perez's arrest and identification.  Although the proceedings were labeled as Mapp/Wade hearing, defense counsel directly asserted that "there [was] no probable cause to arrest my client," (S.H. 23) (emphasis added), and Justice Grasso explicitly ruled on that issue based upon the facts presented:

> THE COURT:  Let me get it out of the way.  There's probable cause.  The point out by the civilian witness in and of itself is sufficient under case law to establish probable cause.

---

[11]    A hearing pursuant to Dunaway v. New York, 442 U.S. 200 (1979), is held on a motion to suppress proof obtained from an illegal arrest.

(S.H. 24). Defense counsel argued that the officers should have taken into account other evidence and offered to provide supporting case law, which the court agreed to consider. (S.H. 24-25). In denying the motion to suppress, however, Justice Grasso ultimately maintained his conclusion that "[t]he identification inside the bar in and of itself establishes probable cause. That's probable cause . . . There was probable cause to place the defendant in a lineup." (S.D. 6-7).

Moreover, when Perez complained to the court at a later conference that his attorney "was supposed to put in a motion for the evidence that the Assistant District Attorney fabricated," (H-4. 6), Justice Barry Kron confirmed on the record that "[a]ll the appropriate requests to suppress evidence were made and hearings were conducted before Judge Grosso. Whether you are happy with the ultimate result that was reached, has nothing to do with the fact that [defense counsel] was representing you in an appropriate fashion." (H-4. 7). Indeed, the Second Circuit has noted in the habeas context that "all that the Supreme Court required was that the state provide the opportunity to the state prisoner for a full and fair litigation of the Fourth Amendment claim." Capellan, 975 F.2d at 70 (citation and internal bracketing omitted) (emphasis in original). Perez had that opportunity and his trial counsel vigorously contested the issue of probable cause in the arrest context, though the trial court did not ultimately agree with his position.

In sum, having availed himself a full and fair opportunity to litigate his Fourth Amendment claim in state court through New York's corrective procedures, Perez may not raise it on federal habeas review.

### D.    Motion for Production and to Expand the Record

This Court previously reserved decision as to Perez's request for production of documents and expansion of the record.  (Docket No. 29).  Perez argues in his motion that certain "transcripts and documents" should be produced because they are relevant to his allegation that his counsel failed to "vehemently seek a ruling on my probable cause claim." (Docket No. 27 Ex. 1 at 3).[12]

As the Supreme Court has stated, a "habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."  Bracy v. Gramley, 520 U.S. 899, 904 (1997).  In particular, Rule 6(a) of the Rules Governing Section 2254 Cases provides that a petitioner is entitled to seek discovery "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  Bracy, 520 U.S. at 908-09 (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)).  Perez has made no such showing.  Indeed, this Court has determined that Perez had a full and fair opportunity to litigate his Fourth Amendment probable cause claim, which is the subject of the discovery he now seeks.  Accordingly, his motion for production of documents and expansion of the record is denied.

---

[12]    It is worth noting that Perez, exhibiting a fair degree of legal savvy, has previously sought – and obtained – similar records through Freedom of Information letter requests and Article 78 state court proceedings.  Indeed, on July 21, 2008, Justice Emily Goodman so-ordered a stipulation signed by Perez and New York City Police Department's legal counsel, providing for disclosure of twenty-two pages "consisting of copies of the Command Log maintained by the 115th Precinct for the dates of January 29, 2002, and January 30, 2002, subject to redaction . . . of confidential information."  (Reply Ex. G, "Stipulation of Settlement").

Although Perez later complained of missing "facts that either were or should have been in the log book," (id., Letter to Justice Goodman, dated Aug. 25, 2008, at 1), the legal department had already confirmed that all pages had been disclosed and "nothing pertaining to [Perez's] arrest has been redacted," (id. Letter to Perez, dated August 20, 2008, at 1).

## III.   CONCLUSION

For the reasons set forth above, the instant petition for a writ of <u>habeas</u> <u>corpus</u> (Docket No. 1) and the motion for production (Docket No. 27) are denied in their entireties.  A certificate of appealability shall not be issued because Petitioner has not made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2). The Court certifies that any appeal would not be taken in good faith and therefore <u>in</u> <u>forma</u> <u>pauperis</u> status is denied for the purpose of an appeal.  <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 444-45 (1962).


**SO ORDERED.**

_____/s/_____<br>
SANDRA L. TOWNES<br>
United States District Judge

Dated: December 30, 2010<br>
      Brooklyn, New York